JOHN W. HUBER, United States Attorney (No. 7226)
ROBERT A. LUND, Assistant United States Attorney (No. 9579)
KARIN FOJTIK, Assistant United States Attorney (No. 7527)
ALICIA H. COOK, Trial Attorney, U.S. Department of Justice
MARK K. VINCENT, Assistant United States Attorney (No. 5357)
PATRICK T. MURPHY, Trial Attorney, U.S. Department of Justice (MD Bar)
ADAM L. SMALL, Trial Attorney, U.S. Department of Justice (NY Bar # 4816894)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah  84111
Telephone:  (801) 524-5682

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

JUN 02 2018

D. MARK JONES, CLERK
BY_____
                 DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>RON ROCKWELL HANSEN,<br><br>　　　　　　　　　Defendant. | Case No. _____<br><br>**F E L O N Y<br>C O M P L A I N T**<br><br>COUNT 1, 18 U.S.C. § 794(a)-<br>Attempt to Gather or Deliver Defense<br>Information;<br><br>COUNT 2, 18 U.S.C. § 951-<br>Agent of a Foreign Government;<br><br>COUNTS 3 - 5, 31 U.S.C. § 5332 –<br>Bulk Cash Smuggling;<br><br>COUNTS 6 - 13, 31 U.S.C. § 5324 –<br>Structuring Monetary Transactions;<br><br>COUNTS 14 & 15, 18 U.S.C. § 554 -<br>Smuggling Goods from the United States; |

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

JUN 02 2018

D. MARK JONES, CLERK
BY_____
                 DEPUTY CLERK

Before the Honorable Paul M. Warner, United States Chief Magistrate Judge for the District of Utah, appeared the undersigned, who on oath deposes and says:

## AGENT INTRODUCTION

1. I am a Special Agent of the Federal Bureau of Investigation (FBI). I entered on duty as a Special Agent with the FBI on August 3, 1997. Prior to joining the FBI, I graduated from the New England School of Law in Boston, Massachusetts, and am currently an active member of the Utah State Bar. I am also a member of the United States Supreme Court Bar. During my twenty years with the FBI, I have served as a Special Agent, a Supervisory Special Agent, a Legal Instructor, and Legal Advisor. As such, I have conducted multiple national security investigations, which have involved violations of federal law. Additionally, I have written affidavits, executed search warrants, interviewed victims, interviewed suspects, and conducted arrests. I also served for five years at the FBI Academy where I taught Constitutional Law, Criminal Law, Criminal Procedure, and National Security Law to Special Agents and other law enforcement officers from around the United States. As a Special Agent, I am authorized to investigate violations of the laws of the United States and execute warrants issued under the authority of the United States.

2. The statements contained in this affidavit are based on written and oral information provided by other law enforcement investigators assigned to this case, on information provided by confidential sources, on information contained in records obtained by investigators, and on my own training, experience, and background.  Since this affidavit is being submitted for the limited purpose of obtaining a criminal complaint, not every fact concerning the investigation has been included, but only the facts necessary to establish a foundation for an arrest warrant on the charges alleged in this complaint.

## BACKGROUND

Affiant is aware that at all times material to this Complaint:

### The United States Intelligence Community

3. The United States Intelligence Community (USIC) consisted of U.S. executive branch agencies and organizations that worked separately and together to conduct intelligence activities necessary for the conduct of foreign relations and the protection of the national security of the United States.

4. The U.S. Department of Defense (DoD) was a U.S. executive branch agency tasked with providing the military forces needed to deter war and to protect the security of the United States.

5. The Defense Intelligence Agency (DIA) was a component of DoD and the USIC, which collected (including through classified means), analyzed, produced, and disseminated foreign intelligence and counterintelligence to support national and DoD missions. The DIA planned, managed, and executed intelligence operations during peacetime, crisis, and war. The DIA provided defense-related intelligence for the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, combatant commanders, other DoD components, and non-DoD agencies. Furthermore, the DIA conducted administrative and technical support activities within and outside the United States as necessary for cover arrangements. Other DoD components of the USIC include U.S. Army Intelligence.

6. The FBI was a U.S. government intelligence and law enforcement agency and was a component of the USIC. The FBI was responsible for, among other things, conducting counterintelligence investigations and activities.

**Classified Information**

7. National security information constituted information owned by, produced by, produced for, and under the control of the United States government that related to the conduct of foreign relations or the national defense. Pursuant to Executive Order 13526 and its predecessors, national security information corresponded to three possible classification levels:

a. Information was classified as TOP SECRET if the unauthorized disclosure of that information reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority was able to identify and describe.

b. Information was classified as SECRET if the unauthorized disclosure of that information reasonably could be expected to cause serious damage to the national security that the original classified authority was able to identify and describe.

c. Information was classified as CONFIDENTIAL if the unauthorized disclosure of that information reasonably could be expected to cause damage to the national security that the original classified authority was able to identify and describe.

8. Only individuals determined eligible by an appropriate U.S. government official could lawfully access classified information. Additional requirements dictated that such an individual sign an approved non-disclosure agreement, receive a security clearance, and possess a "need to know" the classified information. Those authorities further required the storage of classified information in an approved facility and container commensurate with its classification level.

9. Classification markings represented the usual means of communicating the need to protect classified national security information. Classified documents typically contained banners on the

top and bottom stating the highest level of classification and any additional controls associated

with the materials, as well as markings relating to the information contained in each paragraph.

10. In addition to classification markings, classified information at times contained

dissemination markings which restricted the distribution of the information. These markings

include "NF" or "NOFORN" dissemination control markings that stood for "No Foreign

Dissemination." The NOFORN marking denoted a limitation to disseminate the information

only to U.S. persons.

## The People's Republic of China Intelligence Services

11. The People's Republic of China intelligence services (PRCIS) encompassed both the

civilian and military components of Chinese intelligence programs. Civilian intelligence

agencies included the Ministry of State Security (MSS) and the Ministry of Public Security

(MPS). The MSS consisted of a central ministry, provincial state security departments, and

municipal state security bureaus, such as the Beijing State Security Bureau (BSSB) and the

Shanghai State Security Bureau (SSSB). The MPS was the principal domestic police and

security agency.

12. The MSS maintained primary responsibility for domestic counterintelligence, foreign

intelligence, and aspects of political and military security. Among other things, the MSS and its

regional bureaus focused on identifying and influencing the foreign policy of other countries,

including the United States. The MSS and its bureaus sought to obtain information on military,

political, economic, and security policies that might affect the People's Republic of China

(PRC), foreign intelligence operations directed at the PRC, and biographical profiles of foreign

politicians and intelligence officers. Much of the PRC's espionage efforts in industrialized

nations focused on acquiring technology that may or may not have been cleared for export. The PRCIS commonly used agents running front companies to purchase high-technology equipment.

13. PRCIS human source operations tended to originate inside the PRC, where the PRCIS preferred to meet with its sources or assets. The PRCIS recruited individuals with direct and second-hand access to information. The PRCIS recruited, among others, individuals who traveled in and out of the PRC for business or study and who could return to their home country to gain employment in the national security system or exploit existing connections. The PRCIS commonly used money to recruit sources.

### The Defendant

14. Ron Rockwell Hansen (HANSEN), a United States (U.S.) citizen, resided in Syracuse, Utah. HANSEN retired from the U.S. Army (Army) as a Warrant Officer with a background in signals intelligence and human intelligence. HANSEN spoke fluent Mandarin-Chinese and Russian. From approximately 2000 to 2006, while serving on active duty in the Army, HANSEN worked as an intelligence case officer for the DIA. He retired from the Army in early 2006 after more than 20 years of service. Upon retirement, DIA hired HANSEN as a civilian intelligence case officer. While on active duty with the Army and while employed as a DIA civilian, HANSEN possessed a TOP SECRET security clearance.

15. As part of the training to become a case officer, HANSEN received training in managing assets, deterring surveillance, avoiding detection, and handling classified and sensitive information.

16. HANSEN eventually resigned from DIA in December 2006, after which he became a member in two companies, H-11 Digital Forensics Company LLC and H-11 Digital Forensics Services LLC (hereinafter referred to collectively as H-11).  HANSEN's primary responsibilities related to H-11's business in Asia.  From approximately 2007 until late 2011, HANSEN maintained office space and an apartment in the PRC and traveled frequently from Utah to the PRC.

17. According to HANSEN, he partnered with two PRC nationals, whom he identified by anglicized names as "Amy" and "Robert," at his H-11 office in Beijing.  According to HANSEN, Robert maintained close connections to numerous contacts within PRCIS agencies.

18. From approximately the end of 2000 until late 2011, HANSEN performed contract work for the U.S. government that provided HANSEN with additional access to classified national defense information.  During his military service, the U.S. government entrusted HANSEN with access to sensitive government materials, including closely held national defense information and classified documents and materials.

19. Between the years 2000 and 2011, HANSEN signed multiple agreements that he would not disclose his work with the U.S. government or the information derived from that relationship.  Over his many years of holding security clearances, HANSEN received training regarding classified information, including the definitions of classified information, the levels of classification, as well as the proper handling, marking, transportation, and storage of classified materials.  HANSEN received training on his duty to protect classified materials from unauthorized disclosure, which included complying with handling, transportation, and storage requirements.  HANSEN received instruction that the unauthorized transportation and storage of those materials risked disclosure and that transmission of the information could endanger the

national security of the United States and the safety of its citizens.

20. As a prerequisite to accessing classified information during his employment with the U.S. government agencies, HANSEN signed numerous contracts containing non-disclosure agreements in which he acknowledged both the harm that could result from the unauthorized disclosure of classified information and the applicability of criminal espionage laws should he make an unauthorized disclosure of such information or should he unlawfully retain such information.

21. Beginning in early 2012, HANSEN attempted to regain access to national defense information by seeking positions of employment or confidence with USIC agencies, often through former DIA associates.

    a. In February of 2012, HANSEN approached U.S. Army Intelligence, through a former DIA associate, and offered to work as a double agent against the PRCIS.

    b. In May of 2012, HANSEN also applied for a position with DIA.

    c. In mid-2013, in a meeting at DIA Headquarters facilitated by a high-ranking DIA officer, HANSEN suggested to a DIA analyst assigned to a classified program targeting the PRC that DIA operate HANSEN as a source.

    d. In November of 2013, when HANSEN's efforts to gain access through those intelligence agencies failed, HANSEN approached another component of the U.S. Army Intelligence through another former DIA associate.

    e. In February of 2015, HANSEN approached the FBI and offered to work as a double-agent against the PRCIS.

    f. In September of 2015, HANSEN contacted a United States House of Representatives member assigned to the House Permanent Select Committee on Intelligence, and

HANSEN proposed that he work as a member of the Representative's staff on intelligence issues.

g. In May of 2016, as set forth in more detail below, HANSEN reestablished contact with a current DIA case officer. In later meetings, HANSEN encouraged that DIA case officer to use HANSEN as a source against the PRCIS.

22. At no time did HANSEN notify the Attorney General of the United States that he was acting as an agent for any foreign government, including the PRC.

23. According to HANSEN's financial records and his admissions to the FBI, between 2011 and 2016, the following companies employed HANSEN after his work with the U.S. government ended:

| Company | Company Description | HANSEN's Role | Employment Dates (based on Payroll Checks) |
|---|---|---|---|
| Logicube | Computer Forensics Hardware Manufacturer | Director of Worldwide Sales | September 2011 – July 2012 |
| Smith Electric Vehicles | Electric Vehicle Design and Production | Contractor | July 2014 – March 2016 |

24. According to HANSEN's financial records and business registration records, HANSEN possessed an ownership interest in the following entities:

| Entity | Description | Business Address | Initial Registration Date | HANSEN's Role | Account Signatory | Main Account |
|---|---|---|---|---|---|---|
| AC-FPS Business Group LLC | American Chinese Friendship Promotion Society | 57 W 200 S Suite 302 Salt Lake City, UT | March 26, 2013 | Owner | Yes | Wells Fargo x6750 |
| H-11 Digital Forensics Services LLC | Computer Forensics Company | 57 W 200 S Suite 302 Salt Lake City, UT | July 9, 2007 | Chief Executive Officer/ Owner | Yes | Wells Fargo x3972 |
| H-11 Digital Forensics | Computer Forensics Company | 57 W 200 S Suite 302 Salt Lake City, UT | November 20, 2006 | Chief Executive Officer/ | Yes | Wells Fargo x8498 |

| Company LLC | | | | Owner | | x1000 |
|---|---|---|---|---|---|---|
| Nuvestack LLC | Cloud Computing Company | 600 17th St Denver, CO | November 19, 2013 | Owner | Yes | Wells Fargo x0702 |
| Nuvestack Inc. | Cloud Computing Company | 57 W 200 S Suite 302 Salt Lake City, UT | September 25, 2015 | Owner | Yes | Wells Fargo x4721 |

25. Nuvestack provided cloud computing IT services.  American and Chinese Friendship Promotion Society Business Group (AC-FPS) provided a method through which HANSEN attempted to generate revenue by providing business services in the PRC.

26. Between September of 2012 and the date of this Complaint, HANSEN had only intermittent periods of verifiable income.  HANSEN's military pension, which paid approximately $1,900 in net monthly income, constituted his only consistent source of income.

27. According to jointly-filed, personal tax returns for tax years 2013 through 2016, HANSEN claimed large losses from his affiliated partnerships, including Nuvestack, AC-FPS, and H-11, resulting in less than $40,000 in his gross adjusted income reported each year.  For tax years 2013-2016, AC-FPS recorded business losses each year.  Nuvestack filed its initial U.S. Return of Partnership Income for tax year 2013 and claimed $0.00 income and $64,002 in expenses. According to Nuvestack's U.S. Return of Partnership Income for tax year 2014, business losses claimed were -$1,114,889 with only $4,000 in gross receipts.  Nuvestack failed to file taxes in 2015 and 2016 and carried significant debt.

28. In addition to the financial strain caused by his ownership interests, between 2012 and the date of this Complaint, HANSEN's personal unsecured debt ranged from $150,000 to $200,000. HANSEN exhausted his own credit limit and, as of late 2016, HANSEN began to borrow funds against credit cards belonging to his family members.

## Meetings with the FBI

29. In 2014, the FBI commenced an investigation into HANSEN's activities.  Throughout 2015, while unaware of the pending investigation, HANSEN participated in nine voluntary meetings with FBI agents in Salt Lake City, Utah.  HANSEN claimed that he initiated the meetings with FBI in an attempt to offer his cooperation as a source. During those meetings, HANSEN described numerous encounters with PRCIS officials, and HANSEN disclosed that agents of the PRCIS targeted him for recruitment.

30. HANSEN told the FBI that, by at least early 2014, he began meeting with two MSS officers known to him as "David" and "Martin."  HANSEN described meeting with David and Martin in private rooms in tea houses and hotels in Beijing, and explained that Robert set up those meetings.  HANSEN related that during a business trip to the PRC in early 2015, David and Martin offered him $300,000 per year in exchange for providing "consulting services." HANSEN reported that David and Martin asked him to attend conferences or exhibitions on forensics, information security, and military communications and to conduct product research. HANSEN stated that David and Martin gave him money by overpaying him for purchases of computer forensic products.

31. In March of 2015, when asked how he could obtain information for the PRCIS, HANSEN told the FBI that he "could start going to Washington, D.C. and meeting with friends who are in the intelligence community and try and elicit classified info from them."  However, HANSEN acknowledged that doing so would constitute "alerting behavior."  Physical surveillance and court-authorized intercepted phone calls confirm that HANSEN began reaching out to former DoD and DIA associates that same year and continuing into 2016.  Several of those associates had not had contact with HANSEN in many years.

32. In June and July of 2015, HANSEN gave the FBI two thumb drives containing several reports that he wrote and other materials he obtained during his work with the U.S. government. When asked by the agents how he safeguarded the material, HANSEN replied that he stored the material on external drives and maintained these drives in a safe in his home. The two thumb drives did in fact contain classified information that HANSEN was not authorized to retain.

33. In December of 2015, in the final meeting with FBI agents, HANSEN reiterated his potential value to the PRCIS, suggesting the PRCIS could direct him to contact two specific DIA case officers in Texas and Georgia. At the conclusion of the meeting, FBI agents admonished HANSEN that he must not accept the MSS's offer to work for them. The FBI agents further instructed HANSEN that he must inform the FBI if the PRCIS continued to contact him. At no point thereafter, despite his later admissions to others about his continual meetings with the MSS, did HANSEN report any further interaction with PRCIS to the FBI. As described more fully below, in May of 2016, HANSEN traveled to Texas and met with one of the DIA case officers he mentioned to the FBI in December 2015.

**Attending Conferences**

34. During the course of the investigation, the FBI learned that HANSEN began attending conferences on behalf of the PRC and its officials as early as 2013 and continued doing so through 2017. The FBI conducted surveillance of HANSEN at some of those conferences. FBI surveillance personnel observed HANSEN typing notes on his laptop computer and taking photographs of the presenters.

35. From September 9-10, 2015, HANSEN attended the Intelligence & National Security Summit in Washington, D.C. sponsored by the Intelligence and National Security Alliance (INSA) and the Armed Forces Communications and Electronics Association (AFCEA). From

April 20-22, 2016, HANSEN attended the AFCEA-sponsored Defense Cyber Operations Symposium in Washington, D.C.  From September 7-8, 2016, HANSEN again attended the Intelligence & National Security Summit in Washington, D.C.  From November 15-17, 2016, HANSEN attended the AFCEA-sponsored TechNet Asia Pacific Conference in Honolulu, Hawaii.  From September 6-7, 2017, HANSEN attended the Intelligence & National Security Summit in Washington, D.C.

36.  Although HANSEN registered for conferences under the name of Nuvestack Inc., he listed his home address rather than the Nuvestack address on registration documents.  Recorded phone calls reveal that HANSEN attempted to conceal his attendance at the TechNet conference by asking a close Nuvestack associate not to disclose his location while at the conference.  While at the conferences, HANSEN also affirmatively misrepresented to the Nuvestack president and other employees that he had been recalled to military duty.

## HANSEN's Travel and Searches

37.  During the investigation, the FBI also monitored HANSEN's travel.  On several instances during the investigation, the FBI enlisted the assistance of officers from U.S. Customs and Border Protection (CBP) to assist with searching and questioning HANSEN as he traveled back to the U.S. from the PRC.  Between 2014 and 2017, in each instance that officers from CBP searched HANSEN'S luggage or carry-on baggage, while he cleared customs on his travel back to Utah from the PRC, HANSEN carried currency and various digital devices, including cellular phones, smart phones, thumb drives, a laptop computer, and/or other digital storage media.

38.  HANSEN traveled to the PRC on June 30, 2014, and returned to the U.S. through the Detroit Metropolitan Airport on July 9, 2014.  Upon his return, HANSEN knowingly failed to

report that he was carrying currency in excess of $10,000, and he failed to complete and submit a

Report of International Transportation of Currency or Monetary Instruments (FINCEN Form

105) as required. In Detroit, CBP conducted a secondary inspection of HANSEN's carry-on

luggage. When HANSEN realized that CBP intended to search his possessions, HANSEN told

the CBP officer that he had failed to declare currency over $10,000. After the interaction with

the CBP officer, HANSEN then disclosed that, in fact, he carried $19,222. HANSEN

subsequently completed the required FINCEN Form 105.

39. HANSEN traveled to the PRC on December 5, 2015, and he returned to the U.S. on

December 14, 2015. Upon his return, a court-authorized search of HANSEN's carry-on luggage

revealed a passcode-protected thumb drive concealed behind a sock in the toe of a shoe. A

forensic image of the thumb drive revealed the file names of photographs and notes related to the

September 2015 INSA Summit. The forensic examination also revealed that the thumb drive

had been accessed during HANSEN's stay in the PRC. HANSEN's suitcase contained brochures

and other materials related to the September 2015 INSA summit. The suitcase also contained a

print-out establishing HANSEN's membership in AFCEA starting in June of 2013. HANSEN

also carried his MacBook Pro computer and $53,000 in cash. HANSEN told CBP officers that

the $53,000 represented proceeds from the sale of a Netwitness server; however, HANSEN

could not produce any documentation to verify the sale of the product.

40. On April 18, 2016, during HANSEN's trip to Washington, D.C. to attend the AFCEA

conference, the FBI conducted a court-authorized search of HANSEN's hotel room and created a

forensic image of HANSEN's MacBook Pro computer. One document found on the computer,

saved under the file name "Business Development," contained expenses related to HANSEN's

attendance at conferences, AFCEA membership renewal, and INSA membership. The Business

Development document also contained a list of names and contact information of former

DoD/DIA associates of HANSEN.  Several of the contacts continued to work for the United

States government, including an individual who later began operating as a Confidential Human

Source ("CHS").  The Business Development document also included names of U.S. politicians

representing the State of Utah.  HANSEN did not have any business dealings with the vast

majority of the individuals listed in the document.  Additionally, during the forensic

examination, the FBI discovered printer file records indicating that, days before his trip to the

PRC in December of 2015, HANSEN printed information from LinkedIn related to several

former and current DIA case officers.

41. Other documents stored on the computer contained information about the U.S. military

and other conferences that HANSEN previously attended, including information detailing U.S.

Cyber Command locations, personnel, and organizational structure.

42. HANSEN traveled to the PRC again on July 17, 2016, and he returned to the U.S. on July

23, 2016.  A court-authorized search of HANSEN's luggage when he returned revealed that he

carried the same password-protected thumb drive with him as he had on December 14, 2015.  A

forensic examination revealed two documents located in the unallocated space on the thumb

drive, evidencing an attempt to delete the documents. One document contained notes about the

Defense Information Systems Agency, relating to the AFCEA conference HANSEN attended in

April of 2016.  The examination further revealed that the thumb drive had last been accessed on

July 18, 2016, during HANSEN's trip to the PRC.

43. The other document started with an itemized list of expenses related to his May 2016 trip

to Texas.  The document also contained past and current locations of DIA facilities in San

Antonio, as well as cryptic notes related to the classified program and DIA personnel, and

cryptic notes about a DIA case officer hiring initiative. The document also contained dates, titles, and locations of upcoming military, intelligence, and technology conferences.

44. HANSEN traveled to the PRC again on December 14, 2017, and he returned to the U.S. on December 19, 2017. Upon his return during customs processing, the FBI conducted a court-authorized search of HANSEN's luggage and possessions. HANSEN carried a MacBook Air computer. A forensic examination of the computer revealed a document saved to the computer under the file name "Notes_INSA Summit2016." The document contained several pages of extensive notes about the INSA Summit that HANSEN attended in Washington, D.C. in September of 2016, as well as cryptic notes about his meetings with three former DIA associates during that trip to Washington, D.C.

45. The notes also included expenses related to HANSEN's travel and attendance at the summit in Washington, D.C. The cryptic notes included the initials of the first and last names of the former DIA associates, the dates he met them, and other information likely related to his discussions with them, including cryptic notes related to their employment, such as work with "special ops community" and a specific U.S. government intelligence agency. The cryptic notes also included the initials of the spouse of one of the former DIA associates and the date in July of 2016, when HANSEN had a chance meeting with her while traveling in Japan. At the time, the spouse worked as a DIA employee. The cryptic notes also included the initials of the CHS with an August date, followed by the note "med board," referring to discussions between HANSEN and the CHS about the CHS' medical condition and the CHS' U.S. Army medical board status. The document also contained the date, title, and location of a November 2016 military, intelligence, and technology conference, which HANSEN attended.

**HANSEN's Communications with PRCIS**

46. HANSEN consistently touted his access to PRCIS intelligence officers throughout the 2015 voluntary meetings with the FBI. As noted above, in February 2015, HANSEN described his ongoing meetings with MSS intelligence officers David and Martin, saying those meetings began in 2014 and continued into 2015. He explained that he stopped traveling to the PRC after December of 2011 while he was applying to return to work with DIA, but he resumed travel in April of 2013 upon learning he would not be hired. HANSEN described a succession of PRCIS intelligence officers with whom he met during visits to the PRC. He identified one of the officers as Max, who he said later introduced him to David and Martin, who he then began meeting with exclusively.

47. In the next voluntary meeting with the FBI in March of 2015, HANSEN further described the PRCIS intelligence officer as Max Tong, but said he was unsure if Tong was Max's real last name. HANSEN said he met with Max and Martin in 2013. In the May 2015 voluntary meeting with the FBI, HANSEN again described various PRCIS intelligence officers with whom he met in the PRC over his years of travel. He admitted to using his personal email accounts, including his @ac-fps.org account, to communicate with certain PRCIS intelligence officers. He provided a sheet of paper with the names and contact information of some of the PRCIS intelligence officers. HANSEN identified Max on the sheet of paper he provided, which listed him as "Max Rain" with an email address @foxmail.com. He again identified Max as the PRCIS intelligence officer who introduced him to MSS intelligence officers David and Martin. In the September 2015 voluntary meeting with the FBI, HANSEN provided another document listing his PRCIS contacts, including the years of contact and the officers' affiliation. He identified Max Tong as an MSS intelligence officer assigned to "HUMINT," an acronym for Human Intelligence, with a first meeting date of March 2011.

48. A court-authorized search of HANSEN's email account related to the @ac-fps.org address revealed three email exchanges with Max using his @foxmail.com email account. One of HANSEN's email responses to Max included a contact title of "Rain" for the @foxmail.com email address, further showing these email exchanges were with Max Tong during 2012-13.

49. The emails were sent in mid-2012 and early 2013, and they showed Max's eagerness for HANSEN to resume travel to the PRC. In emails exchanged in July of 2012, HANSEN revealed to Max that he decided to go back to his job at the Department of Defense and he would not be able to travel to the PRC that month. At that time, HANSEN had applied for a position with DIA, which required a security clearance and would have given him renewed access to intelligence reporting. Max sent another email to HANSEN in January of 2013, noting he looked forward to hearing from HANSEN. HANSEN replied in April of 2013, about the time he learned he would not be hired by DIA and right before his first trip back to the PRC since December of 2011, noting he had good news. He wrote that he would be in the PRC the following week, adding that his schedule was busy so they would need to meet early in the morning. He added that he looked forward to seeing Max. HANSEN failed to disclose his ongoing contacts with Max, someone he knew to be a PRCIS intelligence officer, to DIA during his application and security clearance background check investigation.

50. When HANSEN first approached the FBI in February of 2015, he explained that Robert set up his meetings with MSS intelligence officers David and Martin. At a subsequent voluntary meeting with the FBI in March of 2015, when HANSEN again stated that Robert brokered HANSEN's meetings with David and Martin and other PRCIS intelligence officers, the FBI asked HANSEN about Robert's background and why he had direct contact with PRCIS intelligence officers. HANSEN described Robert's access to hundreds of PRCIS officers, adding

that Robert visited PRCIS offices, including the MSS office. At a subsequent voluntary meeting

with the FBI in September of 2015, HANSEN explained that David and Martin opted to no

longer utilize Robert to arrange meetings with HANSEN, but they instead gave HANSEN a

XINDA-model PRC cell phone with Martin's name and telephone number preprogrammed to

allow HANSEN to communicate directly with Martin to set up in-person meetings after

HANSEN arrived in the PRC.

51. The investigation revealed that, as early as July of 2014, HANSEN used various cell

phones to communicate with Martin and others in the PRC. HANSEN's use of multiple cell

phones to communicate covertly with intelligence officers is consistent with case officer

tradecraft training HANSEN received from DIA to communicate securely with human sources.

52. When HANSEN returned from the PRC on July 9, 2014, CBP officers conducted a

secondary inspection of HANSEN's luggage and possessions and found an inexpensive NOKIA-

brand, PRC cell phone. HANSEN also had a U.S. smartphone.

53. When HANSEN returned from the PRC on December 14, 2015, the FBI conducted a

court-authorized search of his luggage and possessions and found an inexpensive XINDA-brand

PRC cell phone packed in his carry-on luggage, which he possessed in addition to the U.S. and

PRC smartphones he carried in his briefcase. The XINDA phone had call data showing

communications with "Martin."

54. Upon HANSEN's return to the U.S. in July 23, 2016, following his travel to the PRC, the

FBI conducted another court-authorized search of his luggage and possessions and found an

inexpensive NOKIA-brand PRC cell phone packed in his carry-on luggage separate from his

U.S. and PRC smartphones located in his briefcase. This NOKIA phone call data showed

communications with "Martin." This was not the same NOKIA-brand cell phone found in

HANSEN's possession by CBP in July of 2014.

55. On July 11, 2017, the FBI conducted a court-authorized search of HANSEN's checked luggage prior to his flight to the PRC and found HANSEN's Huawei-brand PRC smartphone packed in the luggage. The FBI obtained a forensic image of the phone and found several stored incoming and outgoing calls and text messages. The forensic image showed HANSEN began using this smartphone during his travel to the PRC in February of 2015, shortly before he contacted the FBI and reported the alleged recruitment pitch by the PRCIS. The forensic image from July 11, 2017 revealed consistent communication to and from a contact identified in the smartphone as "Martin Chen," beginning with HANSEN's trip to the PRC in December of 2016 and including each subsequent trip to the PRC prior to this outbound travel. Those trips occurred in February of 2017, April of 2017, and May of 2017.

56. When CBP questioned HANSEN about the $53,000 in U.S. currency that he declared upon his return travel from the PRC on December 14, 2015, HANSEN explained that he sold a piece of computer forensic equipment to Martin Chen of the MPS. On February 28, 2017, when describing his meetings with the MSS in the PRC, HANSEN told the CHS that the MSS always knows he is coming to the PRC, adding that they do not call themselves the MSS, they call themselves the MPS.

57. During his voluntary meetings with the FBI in 2015, HANSEN explained his extensive interaction with the MPS. The court-authorized search of HANSEN's MacBook Pro computer in April of 2016 revealed photographs saved to the computer depicting HANSEN with uniformed MPS officers, including some in a room with the MPS logo on the wall of the room, confirming admissions he made to the CHS about having ties to the MPS.

58. During a meeting with CHS in April of 2018, as they discussed how they could

communicate to avoid detection, HANSEN suggested to CHS they use a covert means of communication using email.

## Movement of Money From the PRC to the United States

59. HANSEN did not travel to the PRC during 2012, but he resumed frequent travel to the PRC in April 2013. Since 2013 and through the date of this Complaint, HANSEN traveled to the PRC 40 times.

60. Since at least April of 2013, HANSEN's return from travel to the PRC coincided with him receiving large amounts of money. HANSEN moved money from the PRC to the U.S. using three methods: physically carrying cash across the border after trips to the PRC, Visa card transactions originating from the PRC, and wire transfers originating from the PRC.

61. Since 2008, Amy and Robert operated a PRC-based entity called Beijing Hua Heng Infosec Company (Infosec) which partnered with H-11 to sell computer forensic products in the PRC. During the course of the partnership, H-11 shipped computer forensic products to Infosec. For example, email correspondence in August of 2013 between HANSEN's @ac-fps.com email account and an email account @h11dfs.com provide shipping details for a product shipped internationally on or about August 8, 2013 from a domestic vendor to Infosec in Beijing. An analysis of bank records revealed that Amy and Robert paid for these products via wire transactions originating from the PRC to H-11 business accounts in the United States. In contrast, beginning in May of 2013, Amy and Robert began wiring funds to an AC-FPS business account controlled by HANSEN on dates that coincided with HANSEN's trips to the PRC.

62. For example, HANSEN traveled to the PRC on August 5, 2013, and he returned to the U.S. on August 27, 2013. On or about August 19, 2013, HANSEN sent an email from his @ac-fps.com email account to Amy and Robert at their @ac-fps.com email accounts asking Robert if

he received $15,000 U.S. dollars from HANSEN's driver in the PRC. HANSEN then instructed Robert to send the money to his AC-FPS business account in Utah. On or about August 28, 2013, HANSEN received a $14,985 wire originating from the PRC in his AC-FPS business account.

63. Starting in May of 2013 through June of 2014, HANSEN's travel to the PRC coincided with large cash deposits to HANSEN's personal and business accounts without declarations of currency at the border. In addition, between May of 2013 through September of 2014, Amy and Robert wired funds directly into HANSEN's AC-FPS business account, as set forth in Table 1 below:

| TABLE 1: April 2013–June 2014 Travel from the PRC / No Currency Declarations / Deposits | | | | | |
|---|---|---|---|---|---|
| Travel Dates | Customs Declaration | Deposit Date | Amount | Type | Bank Account |
| April 20 – May 3, 2013 | None Portland,OR | May 3, 2013 | $4,000 | Cash | x4798 Hansen personal |
| | | May 7, 2013 | $1,000 | | |
| | | | $12,000 | | x6750 AC-FPS |
| | | May 13, 2013 | $14,985 | Wire | |
| May 26 – June 6, 2013 | None Portland,OR | June 6, 2013 | $5,000 | Cash | x4798 Hansen personal |
| | | June 7, 2013 | $14,985 | Wire | x6750 AC-FPS |
| August 5 – August 27, 2013 | None Portland,OR | August 28, 2013 | $5,500 | Cash | x4798 Hansen personal |
| | | | $14,985 | Wire | x6750 AC-FPS |
| November 18 – November 26, 2013 | None Seattle,WA | November 26, 2013 | $9,000 | Cash | x4798 Hansen personal |
| | | November 29, 2013 | $10,000 | | x6750 AC-FPS |
| January 4 – January 18, 2014 | None Detroit,MI | January 14, 2014 | $9,985 | Wire | x6750 AC-FPS |
| | | January 21, 2014 | $7,000 | Cash | x4798 Hansen personal |
| February 17 – February 26, 2014 | None Seattle,WA | February 26, 2014 | $1,000 | Cash | x4798 Hansen personal |
| | | February 28, 2014 | $5,000 | | |
| | | March 11, 2014 | $1,000 | | |
| | | March 17, 2014 | $800 | | |
| March 19 – March 26, 2014 | None Seattle,WA | March 26, 2014 | $9,900 | Cash | x0702 Nuvestack |
| | | March 27, 2014 | $9,900 | | |
| | | | $1,000 | | x4798 Hansen personal |
| | | March 31, 2014 | $6,400 | | |
| April 20–April 26, 2014 | None Seattle,WA | April 30, 2014 | $4,000 | Cash | x0702 Nuvestack |
| | | May 5, 2014 | $900 | | x4798 Hansen personal |

| Travel Dates | Customs Declaration | Deposit Date | Amount | Type | Bank Account |
|---|---|---|---|---|---|
| | | May 21, 2014 | $3,000 | | |
| June 4- June 13, 2014 | None Seattle, WA | June 11, 2014 | $7,985 | Wire | x6750 AC-FPS |
| | | June 13, 2014 | $5,000 | | |
| | | June 17, 2014 | $1,300 | Cash | x4798 Hansen personal |
| | | June 20, 2014 | $1,000 | | |
| | | June 30, 2014 | $2,000 | | |
| TOTAL: | $168,625 | | | | |

64. After his interdiction by CBP on July 9, 2014, HANSEN began declaring U.S. currency on a regular basis upon his return from the PRC. HANSEN's travel to the PRC from June 2014 through December 2015 similarly coincided with large cash deposits to HANSEN's personal and business accounts, as set forth in Table 2 below:

| TABLE 2: July 2014 - December 2015 Travel from the PRC / Some Large Currency Declarations / Deposits | | | | | |
|---|---|---|---|---|---|
| Travel Dates | Customs Declaration | Deposit Date | Amount | Type | Bank Account |
| June 30 - July 9, 2014 | $19,222 in Detroit, MI (Form Filed) | July 10, 2014 | $9,000 | Cash | x4798 Hansen personal |
| | | July 11, 2014 | $2,500 | | x4892 K.H. personal |
| | | July 17, 2014 | $1,000 | | x4798 Hansen personal |
| | | July 18, 2014 | $1,800 | | x4892 K.H. personal |
| August 27- September 6, 2014 | $4,000 in Seattle, WA | September 5, 2014 | $9,985 | Wire | x6750 AC-FPS |
| September 17- October 1, 2014 | None Portland, OR | October 1, 2014 | $7,500 | Cash | x4798 Hansen personal |
| October 15- October 29, 2014 | $27,775 in Seattle, WA (Form Filed) | October 30, 2014 | $5,000 | Cash | x1730 Hansen personal |
| | | | $8,000 | | x4798 Hansen personal |
| | | November 7, 2014 | $1,500 | | |
| November 15- November 22, 2014 | None Seattle, WA | November 24, 2014 | $5,000 | Cash | x6750 AC-FPS |
| | | | $2,000 | | x1730 Hansen personal |
| December 15- December 20, 2014 | $30,000 in Seattle, WA (Form Filed) | December 22, 2014 | $1,000 | Cash | x4892 K.H. personal |
| | | December 23, 2014 | $9,000 | | x6750 AC-FPS |
| | | | $6,000 | | |
| | | January 15, 2015 | $1,500 | | x1730 Hansen personal |
| January 26 – February 5, 2015 | $19,650 in Detroit, MI (Form Filed) | February 9, 2015 | $1,000 | Cash | x4798 Hansen personal |
| | | February 26, 2015 | $6,500 | | x1730 Hansen personal |
| February 27- March 11, 2015 | None Seattle, WA | March 18, 2015 | $5,000 | Cash | x1730 Hansen personal |
| April 6 – April 16, 2015 | $30,040 in Seattle, WA (Form Filed) | April 17, 2015 | $5,000 | Cash | x4798 Hansen personal |
| | | | $6,800 | | x1730 Hansen personal |
| | | April 27, 2015 | $4,500 | | |

23

| | | | | | |
|---|---|---|---|---|---|
| | | May 4, 2015 | $2,000 | | x4798 Hansen personal |
| June 4 – June 9, 2015 | None, Seattle, WA | June 10, 2015 | $5,000 | Cash | x1730 Hansen personal |
| | | June 22, 2015 | $1,700 | | x6750 AC-FPS |
| | | | $1,592 | | x1963 Fahodie for Friends |
| July 21 – July 26, 2015 | $20,700 in San Fran, CA (Form Filed) | July 27, 2015 | $5,000 | Cash | x1730 Hansen personal |
| | | July 30, 2015 | $5,000 | | x6750 AC-FPS |
| | | August 10, 2015 | $3,000 | | x1730 Hansen personal |
| | | August 11, 2015 | $1,008 | | x4798 Hansen personal |
| | | August 24, 2015 | $3,300 | | |
| August 16 – August 27, 2015 | $20,267 in Seattle, WA (Form Filed) | August 28, 2015 | $7,000 | Cash | x1730 Hansen personal |
| | | September 2, 2015 | $2,500 | | x4798 Hansen personal |
| | | September 3, 2015 | $2,900 | | |
| | | September 14, 2015 | $5,000 | | x1730 Hansen personal |
| December 5 – December 14, 2015 | $53,000 in Seattle, WA (Form Filed) | December 14, 2015 | $8,000 | Cash | x1730 Hansen personal |
| | | | $8,000 | | x4798 Hansen personal |
| | | December 15, 2015 | $7,400 | | x6750 AC-FPS |
| | | December 16, 2015 | $1,000 | | x4892 K.H. personal |
| | | January 6, 2016 | $2,900 | | x4798 Hansen personal |
| | | | Total: $169,885 | | |

65. In conversations with law enforcement officials and others, HANSEN offered varying explanations regarding the source of his cash. For example, HANSEN claimed to CBP and FBI on at least one occasion that the cash related to the sale of surplus inventory and equipment following the 2013 closing of H-11 Beijing. However, in March of 2015, HANSEN told the FBI that he no longer had surplus inventory and equipment to sell in the PRC. When questioned by CBP about cash carried into the U.S., HANSEN never provided any documentation to confirm the sale of any surplus inventory or equipment from H-11 Beijing. As Tables 2 and 3 illustrate, HANSEN continued to bring significant sums of cash into the U.S. even after he advised CBP officers and FBI agents that little or no H-11 inventory or equipment remained to sell.

66. After receiving scrutiny by CBP regarding his pattern of carrying cash into the U.S. following trips to the PRC, HANSEN developed another method to transfer U.S. currency to his

U.S. bank accounts using credit cards. During a phone call with a business associate on or about June 10, 2016, HANSEN stated that he found "another way" to move money out of the PRC. HANSEN explained that the PRC government places an annual limit of $50,000 per individual to transfer funds out of the PRC. To avoid the $50,000 limit, HANSEN further explained that an individual could transfer funds out of the PRC using credit cards.

67. Emails confirm that, as early as March of 2016, HANSEN transferred money from the PRC using Visa cards with the assistance of Amy and Robert. The emails containing Visa card numbers included references such as "for Ron," "Ron's money," and "Money In from RH." Amy provided the Visa card numbers to both HANSEN and an accountant. Thereafter, at HANSEN's direction, the accountant processed the Visa card transactions through U.S.-based merchant accounts and then transferred the funds to HANSEN's personal and business accounts, as demonstrated in examples detailed below.

68. HANSEN traveled to the PRC on July 17, 2016, and he returned to the U.S. on July 23, 2016. HANSEN did not declare any currency at the airport. When questioned by CBP, HANSEN admitted carrying $9,970, an amount just under the reporting threshold. HANSEN told CBP officers that he would no longer carry currency across the border and that he would instead have money sent to him via Visa card transactions. HANSEN told CBP the Visa card transactions would involve a 3% fee, but he would rather pay the fee than be interviewed by CBP. On or about July 24, 2016, Amy sent an email to HANSEN and the accountant stating that there was "USD15,000 in this visa card for Ron." On July 27, 2016, the accountant processed the $15,000 Visa card transaction through the Nuvestack merchant account.

69. HANSEN traveled to the PRC on December 3, 2016, and he returned to the U.S. on December 10, 2016. On or about December 12, 2016, in a telephone conversation with the

accountant, HANSEN described how he directed Amy and Robert to send $49,000 to the U.S. in increments of $10,000, $10,000, $15,000, and $14,000. On or about December 9, 2016, December 14, 2016, and December 22, 2016, Amy sent emails to HANSEN and the accountant with subject lines "Ron's money" and "third part of Ron's money." At HANSEN's direction, the accountant processed $49,000 total in Visa card transactions through the Nuvestack merchant account.

70. On February 28, 2017, HANSEN told the CHS that the MSS always pays him in cash and he gives the cash to Amy and Robert to wire to him. HANSEN also told the CHS that he sometimes carries cash but he has to declare it if it is over $10,000.

71. HANSEN traveled to the PRC on May 11, 2017, and he returned to the U.S. on May 16, 2017. On or about May 17, 2017, HANSEN spoke with Robert by telephone. Robert stated that HANSEN could access the money the following night. Robert said that he can only deposit 5,000 U.S. dollars each day in the PRC, and it takes three days to deposit 15,000 U.S. dollars. On or about May 18, 2017, Amy sent an email to HANSEN and the accountant with subject line "money for Ron," notifying them of the availability of $15,000 "for Ron" on a Visa card. On or about May 19, 2017, the accountant processed the $15,000 Visa card transaction through the Nuvestack merchant account.

72. HANSEN traveled to the PRC on July 11, 2017 and he returned to the U.S. on July 18, 2017. On or about July 19, 2017, Amy sent an email to HANSEN and the accountant stating that "there is USD9000 for Ron on this Visa card." On or about July 20, 2017, the accountant processed the $9,000 Visa card transaction through the Nuvestack merchant account.

73. HANSEN traveled to the PRC on September 21, 2017, and he returned to the U.S. on September 28, 2017. On or about September 28, 2017, HANSEN wrote in an email to a friend in

the PRC, "I have attached the Bank Information for the AC-FPS Business Group. Thank you. Hope to see you soon in Utah. Ron Hansen, CEO | AC-FPS Business Group." The friend responded, "OK." On September 29, 2017, bank records show that a wire originating from the PRC in the amount of $9,985 posted to the AC-FPS business account. On or about October 2, 2017, HANSEN, on a telephone call with a Nuvestack employee, explained the delay in paying the Nuvestack employee. HANSEN explained that the money was not "here" yet because "…they've gotta put some money in the bank…then put some money on a credit card that I can swipe here because the money's coming from Asia." On or about October 4, 2017, Amy sent an email to the accountant and HANSEN stating there was "USD30000 in this visa card for Ron." On or about October 6, 2017, the accountant processed the Visa card through the Nuvestack merchant account.

74. HANSEN traveled to the PRC on November 16, 2017, and he returned to the U.S. on November 21, 2017. On or about November 16, 2017, during a telephone call, a business partner asked HANSEN to repay a $50,000 loan. During a later call, HANSEN stated that he could not produce a $50,000 lump sum payment, but "there are some things aligning." HANSEN stated he would probably get $10,000 to the business partner the following week. On or about November 22, 2017, HANSEN received a $27,985 wire originating from the PRC in his AC-FPS business account from the same friend referenced above. On or about November 22, 2017, HANSEN transferred $10,000, through the Nuvestack business account, to this business partner.

75. HANSEN traveled to the PRC on December 14, 2017, and he returned to the U.S. on December 19, 2017. On or about December 22, 2017, Amy sent an email to HANSEN about transferring money to HANSEN. Bank records show that on December 27, 2017, and January 3,

2018, two Visa card transactions were received in the Nuvestack business account in the amounts of $10,000 and $13,000 respectively.

76. Between July of 2016 and the date of this Complaint, more than $200,000 was processed through the Nuvestack merchant account from PRC bank-issued Visa cards provided by Amy and Robert. For tax year 2016, despite receiving approximately $90,000 through the Nuvestack merchant account using Amy and Robert's Visa cards, Nuvestack failed to file any corporate tax filings with the Internal Revenue Service.

77. For the merchant transactions, wires, and cash deposits described below in Table 3, HANSEN used the majority of the funds to benefit himself, his family members, and other entities, such as Nuvestack and AC-FPS, in which HANSEN held a vested financial interest. Bank records confirm that HANSEN did not transfer those funds to H-11 or use the funds in a way that benefitted H-11. Table 3 illustrates the methods HANSEN employed to transfer U.S. currency from the PRC to the U.S., after scrutiny by CBP in December of 2015:

| TABLE 3: March 2016 - April 2018 No Large Currency Declarations / Cash, Card, and Wire Deposits | | | | | |
|---|---|---|---|---|---|
| Travel Dates | Customs Declaration | Deposit Date | Amount | Type | Account |
| March 9 – March 19, 2016 | None Seattle, WA | March 21, 2016 | $5,500 | Cash | x1730 Hansen personal |
| | | March 22, 2016 | $9,500 | Card | x8498 H-11 Digital Forensics |
| | | March 28, 2016 | $10,400 | | |
| May 7 – May 14, 2016 | None Seattle, WA | May 19, 2016 | $10,000 | Card | x8498 H-11 Digital Forensics |
| | | | $5,000 | Cash | x1730 Hansen personal |
| July 12 - July 23, 2016 | $9,970 Seattle, WA | July 25, 2016 | $8,500 | Cash | x4798 Hansen personal |
| | | July 27, 2016 | $15,000 | Card | x4721 Nuvestack |
| September 15 – September 24, 2016 | $2,000 Seattle, WA | September 23, 2016 | $10,000 | Card | x4721 Nuvestack |
| | | September 26, 2016 | $2,000 | Cash | x4798 Hansen personal |
| | | September 28, 2016 | $10,000 | Card | x4721 Nuvestack |
| | | September 29, 2016 | $6,000 | Card | x4721 Nuvestack |
| December 3 – December 10, 2016 | None Seattle, WA | December 12, 2016 | $10,000 | Card | x4721 Nuvestack |
| | | December 13, 2016 | $10,000 | | |
| | | December 16, 2016 | $15,000 | | |

|  |  | December 19, 2016 | $1,000 | Cash | x4798 Hansen personal |
|  |  | December 23, 2016 | $14,000 | Card | x4721 Nuvestack |
| February 9 – February 18, 2017 | None Seattle, WA | February 21, 2017 | $2,000 | Cash | x4798 Hansen personal |
|  |  | February 22, 2017 | $19,000 | Card | x4721 Nuvestack |
| April 9 – April 17, 2017 | $2,500 Seattle, WA | April 18, 2017 | $16,000 | Card | x4721 Nuvestack |
| May 11 – May 16, 2017 | $2,500 Seattle, WA | May 19, 2017 | $15,000 | Card | x4721 Nuvestack |
| July 11 – July 18, 2017 | None Seattle, WA | July 20, 2017 | $9,000 | Card | x4721 Nuvestack |
| September 21 – September 28, 2017 | $6,000 Seattle, WA | September 29, 2017 | $9,985 | Wire | x6750 AC-FPS |
|  |  | October 6, 2017 | $30,000 | Card | x4721 Nuvestack |
| November 16 – November 21, 2017 | None Seattle, WA | November 22, 2017 | $27,985 | Wire | x6750 AC-FPS |
| December 14 – December 19, 2017 | $4,600 Seattle, WA | December 27, 2017 | $10,000 | Card | x4721 Nuvestack |
|  |  | January 3, 2018 | $13,000 | Card | x4721 Nuvestack |
| January 19 – January 24, 2018 | $1,400 Seattle, WA | January 25, 2018 | $17,985 | Wire | x6750 AC-FPS |
| March 2 – March 6, 2018 | None Seattle, WA | March 7, 2018 | $17,960 | Wire | x6750 AC-FPS |
| April 5 to April 10, 2018 | None Seattle, WA | April 12, 2018 | $17,999 | Wire | x6750 AC-FPS |
| April 23 to April 28, 2018 | None Seattle, WA | May 2, 2018 | $21,985 | Wire | x6750 AC-FPS |
|  |  | **Total:** | **$369,799** |  |  |

78. Tables 1-3 summarize some, but not all, of the U.S. currency HANSEN declared to CBP or funds deposited into U.S. bank accounts contemporaneous with his travel from the PRC. From May of 2013 to the date of the Complaint, HANSEN received not less than $800,000 in funds originating from the PRC.

**Export Control**

79. Under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701 et seq., Congress granted to the President of the United States the authority to deal with unusual and extraordinary threats to the national security, foreign policy, and the economy of the U.S. Under IEEPA, the President can declare a national emergency through Executive Orders that

29

carry the full force and effect of law.

80. The Department of Commerce, Bureau of Industry and Security (DOC-BIS), regulated the export of certain items, such as software with cryptoanalytic capability, through the Export Administration Regulations (EAR), 15 C.F.R. §§ 730-774.  Under the EAR, DOC-BIS imposed license and other requirements before a person could lawfully export an item subject to the EAR from the U.S.  DOC-BIS references such items on the Commerce Control List, published at 15 C.F.R. §774.

81. On August 17, 2001, under the authority of IEEPA, the President issued Executive Order 13222, which declared a national emergency with respect to the unrestricted access of foreign parties to U.S. goods and technologies.  By successive Executive Notices, the President extended the finding of this national emergency and continued the EAR in effect under IEEPA, published most recently on August 15, 2017, at 82 Fed. Reg. 39,005.

82. The Secretary of Commerce maintains the EAR, which identifies items over which DOC-BIS exercises regulatory jurisdiction.  Through the EAR, DOC-BIS imposes a license or other export authorization requirement before an item subject to the EAR may be lawfully exported from the United States or lawfully re-exported from another country.  In particular, DOC-BIS places restrictions on the export of goods and technology that persons abroad might use to harm U.S. national security, foreign policy, and law enforcement interests.

83. Under IEEPA and the EAR, willfully exporting, conspiring to export, attempting to export, or aiding and abetting the export from the U.S. of any item subject to the EAR that required a license without first obtaining the license from DOC constituted a crime.

### Sumuri Recon Software

84. Sumuri LLC (Sumuri), a U.S. company located in Delaware, provided digital forensic training, software, hardware, and services.  Sumuri manufactured the Recon Mac OS X

Forensics with Paladin 6 software (Sumuri Recon software). That software contained cryptographic capability. By at least June 1, 2016, the Sumuri Recon software received an Export Control Classification Number (ECCN) of 5D002.c.1. As a commodity controlled for anti-terrorism and national security reasons, the EAR prohibited the export of that controlled commodity to the PRC without a valid export license from the DOC-BIS.

85. On or about November 29, 2016, Amy requested that HANSEN purchase the Sumuri Recon software and bring it to her in the PRC. On or about December 12, 2016, HANSEN purchased the Sumuri Recon software for $1,717.95 purportedly on behalf of Nuvestack Inc., a U.S. company. On or about December 12, 2016, HANSEN directed an associate to ship the Sumuri Recon software to Amy in the PRC. On or about December 23, 2016, in an email message to HANSEN, Amy confirmed receipt of the Sumuri Recon software. HANSEN previously dealt with DOC-BIS and knew of the licensure requirement for export controlled products. HANSEN did not obtain the requisite license to export the Sumuri Recon software to the PRC.

### Vound Intella Software

86. Vound LLC (Vound), a U.S. company located in Colorado, provided products related to forensic search, e-discovery, and information governance. Vound manufactured the Intella 100 software.

87. For the export of any commodity valued at or above $2,500, the EAR required the exporter to complete an Electronic Export Information form (EEI), previously known as Shipper's Export Declaration (SED), in the Automated Export System (AES). Among other things, that form required the exporter to list the accurate value of the commodity (15 CFR 30). Electronic filing through the AES strengthened the U.S. government's ability to prevent export of certain items to unauthorized destinations and to unauthorized users.

88. On or about December 23, 2016, Amy requested that HANSEN purchase the Intella 100 Software and bring it to her in the PRC. On or about January 8, 2017, HANSEN purchased the Intella software from Vound for $3,030.00. After purchasing the software, HANSEN represented to the Vound sales manager that Nuvestack Inc. would be the end user of the product. Thereafter, HANSEN directed an associate to ship the Intella software to Amy in the PRC, and on or about January 19, 2017, the associate did so. At the request of Amy and with HANSEN's knowledge, HANSEN's associate listed the value of the product on the shipping documentation at $50.00, which HANSEN well knew to be false. HANSEN previously exported other products from the U.S. whose value exceeded $2,500. On those occasions, HANSEN submitted the requisite form, confirming that he knew of the disclosure requirement. HANSEN did not complete the EEI form regarding the export of the Intella software nor did he direct his associate to do so.

### The Confidential Human Source and Attempted Espionage

89. As a routine investigative technique, the FBI enlists the participation of confidential human sources (CHS) to assist in investigations.

90. On May 24, 2016, HANSEN met with two former DIA associates for lunch in San Antonio, Texas. After lunch, HANSEN continued to speak to one of the DIA associates, inquiring about DIA sources and methods of operation. During the conversation, HANSEN disclosed that the MSS approached him. He also described his meetings with the FBI and stated that he "had to give the MSS something to keep stringing them along," while waiting for the FBI to make a decision about his offer to work as a "double agent."

91. Based on HANSEN's statements, the DIA associate filed a suspicious incident report. Thereafter, with DIA approval, the associate agreed to assist the FBI in its investigation by

acting in the capacity of a CHS. At the time, the CHS worked as a DIA case officer.

92. Between 2016 and 2018, the CHS spoke to HANSEN several times. During those conversations, HANSEN disclosed ongoing contact with the MSS, including in-person meetings with senior MSS officers during his trips to the PRC. HANSEN stated that he performed consulting work for the MSS. HANSEN further stated that he sold computer forensic products to the PRCIS for which they "grossly overpaid" him in cash.

93. In October of 2016, HANSEN told the CHS that the MSS was still willing to pay him $300,000 a year to do consulting work. HANSEN related that the MSS asked him to write white papers on cell phones. HANSEN also said the MSS asked him about the views of various U.S. politicians regarding the PRC.

94. In February of 2017, HANSEN told the CHS that he attended intelligence and military conferences for the MSS. HANSEN stated that while none of the information at the conferences was classified, the MSS could not obtain the same information as HANSEN because the MSS would not have the same access to high ranking military officials as HANSEN did.

95. In March of 2018, HANSEN sent the CHS a copy of certain materials that he retained from his time as a U.S. government contractor. HANSEN asked the CHS to look for the information in intelligence reporting to determine how, if at all, the government used it. The materials that HANSEN sent to the CHS remained classified.

96. In March of 2018, HANSEN also told the CHS that he met with a senior MSS intelligence officer during his March trip to the PRC. HANSEN discussed areas of interest expressed by the MSS intelligence officer about U.S. positions related to North Korea, South Korea, and the PRC. In addition to asking the CHS to look in intelligence reporting for information related to the materials HANSEN sent to the CHS, HANSEN also asked the CHS to

look in intelligence reporting for information on a specific issue HANSEN described related to

North Korea. HANSEN also suggested he could act as a conduit to pass information to the MSS.

97. In April of 2018, shortly before HANSEN travelled again to the PRC, HANSEN also

discussed with the CHS his ability to facilitate the sale of national defense information to the

PRCIS, saying he would meet with the MSS during his April trip to the PRC and assess their

interest in information the CHS could obtain and provide. HANSEN discussed with the CHS

ways to conceal their meetings and activities in the U.S. to avoid detection of their intent to sell

national defense information to the PRCIS.

98. Later in April of 2018, HANSEN again met with the CHS shortly after returning from the

PRC. During the meeting, HANSEN discussed the details of how he and the CHS might sell

national defense information to the PRCIS. HANSEN advised the CHS regarding the type of

information the PRCIS would find useful, and HANSEN advised the CHS how to record and

transmit classified information without detection. HANSEN further suggested that the CHS

create notes related to the content of any classified material that the CHS would pass to

HANSEN. HANSEN also discussed the possibility of the CHS doing a debriefing with the

PRCIS in Canada or Mexico. HANSEN asked what amount of compensation the CHS would

require for providing such information. HANSEN advised that the PRCIS might pay up to

$200,000 if the CHS could deliver the "China ops plan," the operations plan of the United States

military regarding potential military intervention with China. HANSEN explained how the CHS

could hide and launder any funds received from the PRCIS, and HANSEN offered to help

launder the money. On multiple occasions during the conversation, HANSEN asked whether the

CHS was recording the meeting or "setting [HANSEN] up to go to jail." At the end of the

meeting, HANSEN discussed using an application that provides encrypted communication for

their future interaction.

99. In early May of 2018, after learning of the CHS' unavailability to meet prior to HANSEN's intended travel to the PRC on May 31, 2018, HANSEN suggested he could delay his travel to the PRC to a later date in order to accommodate the CHS' availability.

100. HANSEN subsequently made plans to travel from Salt Lake City to the PRC on June 2, 2018. He confirmed with CHS that they would meet at a location close the Seattle-Tacoma airport in Seattle, Washington, where HANSEN had a connecting flight to the PRC from the District of Utah.

101. On June 2, 2018, during his layover, HANSEN took a cab to meet CHS at a pre-arranged location close to the Seattle-Tacoma airport. CHS and HANSEN met in CHS' car near the airport and drove to another location, also in the vicinity of the airport. CHS brought two classified paper documents with him ("materials") to his meeting with HANSEN, both of which were classified at the secret level and marked accordingly.

102. At the outset of the meeting HANSEN stated that he did not turn on his phone after he landed to insure that there would be no one tracking their location. CHS informed HANSEN that he had materials to show HANSEN. HANSEN initially responded to this news that he did not want to physically take the materials on his pending trip to the PRC. However, HANSEN later indicated that they should give his contacts in the PRCIS something to ensure that they would continue to work with CHS and HANSEN in the future.

103. CHS had the materials in a concealment device. CHS offered the materials in the device to HANSEN, who attempted to open the device but could not. CHS then took the device back, opened the device, and asked HANSEN if he wanted to see the materials. HANSEN stated that he did and HANSEN then accepted the materials from CHS.

104. While reviewing the materials HANSEN indicated that each paragraph of the materials would be worth a separate ten-minute conversation with the PRCIS. CHS and HANSEN discussed the content of the materials for almost two hours. At one point, CHS asked HANSEN how he would remember all of their discussions and HANSEN stated that he would remember the highlights. CHS observed HANSEN take hand-written notes during their conversation. When CHS dropped off HANSEN, HANSEN indicated that he would take his hand-written notes and incorporate them into an existing Word document. During the majority of their two-hour meeting, HANSEN had the materials in his possession and reviewed them. HANSEN asked the CHS specific questions about the materials for the majority of their time together. At one point during the two hours, CHS left the car for between five and ten minutes. During this time, HANSEN continued to review the materials.

105. CHS and HANSEN also discussed how CHS should procure and store documents that CHS would obtain in the future for the PRCIS. HANSEN advised CHS that he should buy a computer and scanner and take steps to move the materials into a digital format. He also suggested that CHS cut a hole in a nearby tree and hide materials in that location.

106. HANSEN also informed CHS that the PRCIS would have to vet CHS. HANSEN asked for CHS' date of birth, email addresses, employment locations, his social media accounts, and information about CHS' family members to provide to the PRCIS to facilitate the PRCIS vetting process.

107. HANSEN told CHS that he would not receive money after this trip to the PRC. However, he advised CHS that he would arrange for CHS to receive payment after his next trip to the PRC later in June. HANSEN stated he would arrange for his contacts in the PRC to give the money to one of HANSEN's business associates in the PRC who would then wire the funds

to one of HANSEN's businesses. HANSEN would then have the funds "expensed" and arrange

for them to be sent to CHS.

108. After their meeting, CHS dropped HANSEN off at a location close to the Seattle-

Tacoma airport. HANSEN then walked approximately a block from the drop-off location toward

the entrance to a pedestrian bridge that accessed the airport when he was apprehended by the

FBI.

109. When apprehended, HANSEN had in his possession a single page of hand-written

notes. These notes included specific numbers from the materials that HANSEN incorporated into

Utah phone numbers to mask their meaning. Additionally, the notes on the page included CHS'

date of birth, email addresses, and employment locations.

THE UNITED STATES COMPLAINS THAT:

## COUNT 1
### 18 U.S.C. § 794(a)
### (Attempt to Gather or Deliver Defense Information)

110. Paragraphs 1-109 of this Complaint are incorporated by reference and re-alleged as

though set forth fully herein.

111. On or about June 2, 2018, in the Northern Division of the District of Utah and

elsewhere,

### RON ROCKWELL HANSEN,

the defendant herein, did knowingly and unlawfully attempt to communicate, deliver and

transmit directly and indirectly to a foreign government, to wit: the Government of the People's

Republic of China, and representatives, officers, agents, employees, subjects and citizens thereof,

documents and information relating to the national defense of the United States including a

document marked SECRET//NORFORN that related to military readiness in a particular region,

attempt to transport such currency from a place outside the United States to a place inside the

United States, all in violation of 31 U.S.C. § 5332, as set forth below:

| Count | Arrival Date (U.S.) | Customs Declaration | Deposit Date | Currency | Bank Account |
|---|---|---|---|---|---|
| 3 | November 26, 2013 | None Seattle, WA | November 26, 2013 | $9,000 | x4798 WF Hansen personal |
| | | | November 29, 2013 | $10,000 | x6750 WF AC-FPS |
| 4 | March 26, 2014 | None Seattle, WA | March 26, 2014 | $9,900 | x0702 WF Nuvestack |
| | | | March 27, 2014 | $9,900 | |
| | | | | $1,000 | x4798 WF Hansen personal |
| | | | March 31, 2014 | $6,400 | |
| 5 | July 9, 2014 | $19,222 in Detroit, MI (Form Filed) | July 10, 2014 | $9,000 | x4798 WF Hansen personal |
| | | | July 11, 2014 | $2,500 | x4892 WF K.H. personal |
| | | | July 17, 2014 | $1,000 | x4798 WF Hansen personal |
| | | | July 18, 2014 | $1,800 | x4892 WF K.H. personal |

*WF: Wells Fargo*

## COUNTS 6-13
### 31 U.S.C. § 5324
### (Structuring Monetary Transactions)

116. Paragraphs 1-115 of the Complaint are incorporated by reference and re-alleged as set

forth fully herein.

117. Beginning on a date unknown to the United States, but at least by April

2013, and continuing until the date of this Complaint, in the Northern Division of the District of

Utah and elsewhere, the defendant,

**RON ROCKWELL HANSEN,**

did knowingly and for the purpose of evading the reporting requirements of Title 31, United

States Code, Section 5313(a), and the regulations promulgated thereunder, structure and attempt

to structure any transaction with one or more domestic financial institutions, as set forth below:

| Count | Arrival Date (U.S.) | Customs Declaration | Deposit Date | Currency | Bank Account |
|---|---|---|---|---|---|
| 6 | | | November 26, 2013 | $9,000 | x4798 WF Hansen personal |

| | November 26, 2013 | None Seattle, WA | November 29, 2013 | $10,000 | x6750 WF AC-FPS |
|---|---|---|---|---|---|
| 7 | March 26, 2014 | None Seattle, WA | March 26, 2014 | $9,900 | x0702 WF Nuvestack |
| | | | March 27, 2014 | $9,900 | |
| | | | March 31, 2014 | $1,000 | x4798 WF Hansen personal |
| | | | | $6,400 | |
| 8 | October 29, 2014 | $27,775 in Seattle, WA (Form Filed) | October 30, 2014 | $5,000 | x1730 BAF Hansen personal |
| | | | | $8,000 | x4798 WF Hansen personal |
| | | | November 7, 2014 | $1,500 | |
| 9 | December 20, 2014 | $30,000 in Seattle, WA (Form Filed) | December 22, 2014 | $1,000 | x4892 WF K.H. personal |
| | | | December 23, 2014 | $9,000 | x6750 WF AC-FPS |
| | | | | $6,000 | |
| | | | January 15, 2015 | $1,500 | x1730 BAF Hansen personal |
| 10 | April 16, 2015 | $30,040 in Seattle, WA (Form Filed) | April 17, 2015 | $5,000 | x4798 WF Hansen personal |
| | | | | $6,800 | x1730 BAF Hansen personal |
| | | | April 27, 2015 | $4,500 | |
| | | | May 4, 2015 | $2,000 | x4798 WF Hansen personal |
| 11 | July 26, 2015 | $20,700 in San Fran., CA (Form Filed) | July 27, 2015 | $5,000 | x1730 BAF Hansen personal |
| | | | July 30, 2015 | $5,000 | x6750 WF AC-FPS |
| | | | August 10, 2015 | $3,000 | x1730 BAF Hansen personal |
| | | | August 11, 2015 | $1,008 | x4798 WF Hansen personal |
| | | | August 24, 2015 | $3,300 | |
| 12 | August 27, 2015 | $20,267 in Seattle, WA (Form Filed) | August 28, 2015 | $7,000 | x1730 BAF Hansen personal |
| | | | September 2, 2015 | $2,500 | |
| | | | September 3, 2015 | $2,900 | x4798 WF Hansen personal |
| | | | September 14, 2015 | $3,000 | x1730 BAF Hansen personal |
| 13 | December 14, 2015 | $53,000 in Seattle, WA (Form Filed) | December 14, 2015 | $8,000 | x1730 BAF Hansen personal |
| | | | | $8,000 | x4798 WF Hansen personal |
| | | | December 15, 2015 | $7,400 | x6750 WF AC-FPS |
| | | | December 16, 2015 | $1,000 | x4892 WF K.H. personal |
| | | | January 6, 2016 | $2,900 | x4798 Hansen personal |

*WF: Wells Fargo, BAF: Bank of American Fork*

And did aid and abet therein, all in violation of 31 U.S.C. § 5324 and 18 U.S.C. §2.

## COUNT 14
### 18 U.S.C. § 554
### (Smuggling Goods from the United States)

118. Paragraphs 1-117 of the Complaint are incorporated by reference and re-alleged as set forth fully herein.

119. From on or about November of 2016 through January of 2017, in the Northern Division of the District of Utah and elsewhere, the defendant,

**RON ROCKWELL HANSEN,**

and others known and unknown, fraudulently and knowingly did attempt to export and send from the United States, any merchandise, article, and object contrary to any law and regulation of the United States, and did attempt to receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such merchandise, article, and object, prior to exportation, knowing the same to be intended for exportation contrary to any law and regulation of the United States, and aided and abetted the same, to wit, HANSEN did cause to be exported from the United States Sumuri Recon software containing password recovery capability without first having obtained the required licenses from the United States Department of Commerce, and did aid and abet therein, all in violation of 50 U.S.C. §§ 1702 and 1705, 18 U.S.C. §§ 554 and §2, and 15 C.F.R. § 764.2(b).

**COUNT 15**
**18 U.S.C. § 554**
**(Smuggling Goods from the United States)**

120. Paragraphs 1-119 of the Complaint are incorporated by reference and re-alleged as set forth fully herein.

121. From on or about December 23, 2016 through on or about January 19, 2017, in the Northern Division of the District of Utah and elsewhere, the defendant,

**RON ROCKWELL HANSEN,**

fraudulently and knowingly did attempt to export and send from the United States, any merchandise, article, and object contrary to any law and regulation of the United States, and did attempt to receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of

such merchandise, article, and object, prior to exportation, knowing the same to be intended for

exportation contrary to any law and regulation of the United States, and aided and abetted the

same, to wit, HANSEN did cause to be exported from the United States Vound, Intella software

with a falsified value, and did aid and abet therein, all in violation of 18 U.S.C. § 554 and §2, 13

U.S.C. § 305, 15 C.F.R. §30.71, 15 C.F.R. §764.2(g).

122. Based upon the foregoing information, your affiant respectfully requests that an arrest

warrant be issued for Ron Rockwell Hansen for the above-referenced violations of federal law.

DATED this 2nd day of JUNE, 2018.

JONATHAN RUDD, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN BEFORE ME this 2nd day of June, 2018.

PAUL M. WARNER, Chief Magistrate Judge
United States District Court

JOHN W. HUBER
United States Attorney

KARIN FOJTIK
Assistant United States Attorney

42